UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— X

THE NEW YORK TIMES COMPANY,                    :

                            Plaintiff,          :

                                                        No. 20-cv-00833 (PAE)

               v.                               :

FEDERAL BUREAU OF PRISONS,                     :

                            Defendant.          :

———————————————————————————— X

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

David E. McCraw
Al-Amyn Sumar
Alexandra Perloff-Giles
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: 212-556-4031
Facsimile: (212) 556-4634
Email: mccraw@nytimes.com

*Counsel for Plaintiff*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

PRELIMINARY STATEMENT .................................................................................................. 1

FACTUAL BACKGROUND ....................................................................................................... 2

   I.  Epstein's Arrest and Suicide ........................................................................................... 2

   II. Procedural History ......................................................................................................... 4

ARGUMENT ............................................................................................................................... 5

   I.   The Government Has Not Met Its Burden of Showing the Search was Adequate .............. 6

   II.  The Government Has Not Met Its Burden of Justifying Withholding Under Exemption
       7(A) .................................................................................................................................. 8

   III. The Government Has Not Met Its Burden of Justifying Withholding Under Exemptions 6
       and 7(C) ............................................................................................................................ 13

   IV. The Government Has Not Met Its Burden of Justifying Withholding Under Exemption 5 ..
       ........................................................................................................................................ 18

   V.  The Government Has Not Met Its Burden of Justifying Withholding Under Exemption
       7(E) .................................................................................................................................. 21

CONCLUSION ............................................................................................................................ 23

## TABLE OF AUTHORITIES

**CASES**

*ACLU Found. v. Dep't of Homeland Sec.*,
    243 F. Supp. 3d 393 (S.D.N.Y. 2017) ...................................................... 21

*Albuquerque Publ'g Co. v. U.S. Dep't of Justice*,
    726 F. Supp. 851 (D.D.C. 1989) ........................................................... 21

*Am. Civil Liberties Union v. Dep't of Def.*,
    543 F.3d 59 (2d Cir. 2008) ..................................................................... 5

*Assoc. Press v. U.S. Dep't of Defense*,
    554 F.3d 274 (2d Cir. 2009) ................................................................... 5

*Associated Press v. U.S. Dep't of Def.*,
    554 F.3d 274 (2d Cir. 2009) ................................................................. 14

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*,
    601 F.3d 143 (2d Cir. 2010) ............................................................... 5, 6

*Campbell v. Dep't of Health and Human Servs.*,
    682 F.2d 256 (D.C. Cir. 1982) ............................................................... 9

*Church of Scientology v. U.S. Dep't of the Army*,
    611 F.2d 738 (9th Cir. 1979) ................................................................. 9

*Cook v. Nat'l Archives & Records Admin.*,
    758 F.3d 168 (2d Cir. 2014) ................................................................. 17

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
    2019 U.S. Dist. LEXIS 223077 (D.D.C. Dec. 31, 2019) ...................... 20

*Dep't of Air Force v. Rose*,
    425 U.S. 352 (1976) ........................................................................ 5, 14

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
    532 U.S. 1 (2001) ................................................................................. 18

*Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
    489 U.S. 749 (1989) .............................................................................. 2

*Diamond v. FBI*,
    707 F.2d 75 (2d Cir. 1983) ................................................................... 14

*Doherty v. U.S. Dep't of Justice*,
    775 F.2d 49 (2d Cir. 1985) ................................................................... 21

*Envt'l Prot. Agency v. Mink*,
    410 U.S. 73 (1973) ............................................................................... 19

*Gentile v. State Bar of Nev.*,
    501 U.S. 1030 (1991) ........................................................................... 12

*Gonzalez v. U.S. Citizenship & Immigration Servs.*,
    2020 U.S. Dist. LEXIS 134482 (S.D.N.Y. July 29, 2020)...................... 9

*Grand Central P'ship, Inc. v. Cuomo*,
  166 F.3d 473 (2d Cir. 1999) ............................................................................ 18, 19
*Gray v. United States Army Crim. Investigation Command*,
  742 F. Supp. 2d 68 (D.D.C. 2010) ......................................................................... 9
*Hopkins v. U.S. Dep't of Hous. & Urban Dev.*,
  929 F.2d 81 (2d Cir. 1991) .................................................................................. 19
*Human Rights Watch v. Dep't of Justice & Fed. Bureau of Prisons*,
  2015 U.S. Dist. LEXIS 123592 (S.D.N.Y. Sept. 16, 2015) ..................................... 9
*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
  375 F. Supp. 3d 93 (D.D.C. 2019) ....................................................................... 20
*Knight First Amendment Inst. v. U.S. Dep't of Homeland Sec.*,
  407 F. Supp. 3d 334 (S.D.N.Y. 2019) .................................................................. 21
*Kubik v. U.S. Fed. Bureau of Prisons*,
  2011 U.S. Dist. LEXIS 71300 (D. Or. July 1, 2011) ............................................ 21
*Lawyers Comm. for Human Rights v. INS*,
  721 F. Supp. 552 (S.D.N.Y. 1989) ....................................................................... 11
*Local 3, Int'l Bhd. of Elec. Workers v. NLRB*,
  845 F.2d 1177 (2d Cir. 1988) .............................................................................. 19
*Malizia v. U.S. Dep't of Justice*,
  519 F. Supp. 338 (S.D.N.Y. 1981) ......................................................................... 9
*Maydak v. U.S. Dep't of Justice*,
  218 F.3d 760 (D.C. Cir. 2000) .......................................................................... 9, 13
*Mead Data Central, Inc. v. U.S. Dep't of the Air Force*,
  566 F.2d 242 (1977) ............................................................................................. 6
*Meyer v. Bush*,
  1991 U.S. Dist. LEXIS 13626 (D.D.C. Sept. 30, 1991), *rev'd on other grounds*, 981 F.2d 1288
  (D.C. Cir. 1993).................................................................................................... 7
*Morley v. C.I.A.*,
  508 F.3d 1108 (D.C. Cir. 2007) .......................................................................... 14
*Multi Ag Media LLC v. Dep't of Agric.*,
  515 F.3d 1224 (D.C. Cir. 2008) .......................................................................... 14
*N.Y. Times Co. v. FCC*,
  2020 U.S. Dist. LEXIS 76710 (S.D.N.Y. Apr. 30, 2020)....................................... 17
*N.Y. Times Co. v. U.S. Dep't of Justice*,
  872 F. Supp. 2d 309 (S.D.N.Y. 2012) .................................................................... 3
*Nat'l Archives & Records Admin. v. Favish*,
  541 U.S. 157 (2004) ........................................................................................... 15
*Nat'l Council of La Raza v. Dep't of Justice*,
  411 F.3d 350 (2d Cir. 2005) ................................................................................. 6

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214, 227 (1978) ........................................................................ 9, 10
*NRDC v. EPA*,
  2019 U.S. Dist. LEXIS 124353 (S.D.N.Y. July 25, 2019) ........................ 20
*Pratt v. Webster*,
  673 F.2d 408 (D.C. Cir. 1982) .................................................................... 9
*Radcliffe v. IRS*,
  536 F. Supp. 2d 423 (S.D.N.Y. 2008) ...................................................... 10
*United States v. Noel*,
  No. 19-CR-00830-AT (S.D.N.Y. June 9, 2020) ........................................ 13
*U.S. Dep't of Justice v. Tax Analysts*,
  492 U.S. 136 (1989) ................................................................................. 6, 7
*U.S. Dep't of State v. Ray*,
  502 U.S. 164 (1991) ..................................................................................... 5
*Wessler v. U.S. Dep't of Justice*,
  381 F. Supp. 3d 253 (S.D.N.Y. 2019) ...................................................... 15
*Wilner v. NSA*,
  592 F.3d 60 (2d Cir. 2009) .......................................................................... 6
*Wood v. F.B.I.*,
  432 F.3d 78 (2d Cir. 2005) .......................................................................... 6

**STATUTES**

5 U.S.C. § 552 ................................................................................... *passim*

**OTHER AUTHORITIES**

Ali Watkins & Michael Gold, *Jeffrey Epstein Autopsy Results Show He Hanged Himself in Suicide*, N.Y. Times (Aug. 16, 2019) ........................................................ 16
Ali Watkins, Danielle Ivory & Christina Goldbaum, *Inmate 76318-054: The Last Days of Jeffrey Epstein* (Aug. 17, 2019) ....................................................................... 16
Ali Watkins, Katie Benner & Danielle Ivory, *In Short-Staffed Jail, Epstein Was Left Alone for Hours; Guard Was Substitute*, N.Y. Times (Aug. 12, 2019) ........................... 1
Fed. Bureau of Prisons, *Program Statement: Suicide Prevention Program* (Apr. 5, 2007)... 21, 22
Fed. Bureau of Prisons, *Suicide Prevention in a Correctional Setting – Lessons Learned* (Dec. 2011) .......................................................................................................... 21
FOIA Request from Paul D. Kamenar, Counsel for NLPC, to BOP FOIA Officer (Aug. 12, 2019) ......................................................................................................... 8
Julie K. Brown, *Jeffrey Epstein Wasn't Trafficking Women – And He Didn't Kill Himself, Brother Says*, Miami Herald (Nov. 14, 2019) ........................................... 15

Matt Zapotosky, *Trump questions whether Jeffrey Epstein was killed in federal custody. His attorney general and the medical examiner say it was suicide*, Wash. Post (Aug. 4, 2020)…… ............................................................................................... 1, 18

National Legal and Policy Center, *NLPC Files FOIA Request Seeking Photos Of Jeffrey Epstein And Records Surrounding His Apparent Suicide* (Aug. 12, 2019) ............................................. 8

Nick Bryant, *Here Is Pedophile Billionaire Jeffrey Epstein's Little Black Book*, Gawker (Jan. 23, 2015)................................................................................................................................. 16

Office of the Inspector General, *Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization* (March 2020)....................................................... 17

Patricia Mazzei, *Years After Plea Deal in Sex Case, Jeffrey Epstein's Accusers Will Get Their Day in Court*, N.Y. Times (Nov. 29, 2018) ............................................................................ 2

S. Rep. No. 114–4, at 8 (2015) ..................................................................................................... 20

Skyler Swisher & Marc Freeman, *Jeffrey Epstein's Special Treatment in Jail Was Far More Lenient Than Anyone Knew*, S. Fla. Sun Sentinel (Aug. 16, 2019) ......................................... 16

Steve Eder & Ali Watkins, *Jeffrey Epstein's Will: He Signed 2 Days Before Killing Himself*, N.Y. Times (Aug. 19, 2019)................................................................................................... 16

U.S. Dep't of Justice Nat'l Inst. of Corrections, *National Study of Jail Suicide: 20 Years Later* (Apr. 2010) ............................................................................................................................ 22

U.S. Dep't of Justice Nat'l Inst. of Corrections, *Prison Suicide: An Overview and Guide to Prevention* (1995)............................................................................................................. 21, 22

World Health Organization, *Preventing Suicide in Jails and Prisons* (2007).............................. 22

Plaintiff The New York Times Company ("The Times") respectfully submits this memorandum of law in opposition to the motion for summary judgment by Defendant Federal Bureau of Prisons ("BOP") and in support of The Times's cross-motion for summary judgment on its complaint brought under the Freedom of Information Act ("FOIA").

## PRELIMINARY STATEMENT

Financier Jeffrey Epstein's suicide in August 2019, and subsequent revelations about what Attorney General William Barr called the Metropolitan Correctional Center's (MCC) "failure to adequately secure this prisoner," led to widespread calls for accountability and reform. Ali Watkins, Katie Benner & Danielle Ivory, *In Short-Staffed Jail, Epstein Was Left Alone for Hours; Guard Was Substitute*, N.Y. Times (Aug. 12, 2019), https://nyti.ms/2F9mXzs. The Federal Bureau of Investigation, the Department of Justice's Inspector General, and the Bureau of Prisons itself all launched investigations. For his part, the President has suggested that Epstein was "killed" while in federal custody. Matt Zapotosky, *Trump questions whether Jeffrey Epstein was killed in federal custody. His attorney general and the medical examiner say it was suicide*, Wash. Post (Aug. 4, 2020), https://wapo.st/2Zij5mA. As part of the public scrutiny of the "serious irregularities" at the facility, reporters at The Times filed several Freedom of Information Act requests, seeking records that would shed light on the conditions of Epstein's confinement and the circumstances surrounding his death.

BOP has withheld or heavily redacted thousands of pages of records responsive to those requests, citing a smattering of FOIA exemptions. Among other things, the Government has improperly invoked FOIA's privacy exemptions to shield information that is in the public interest, failed to justify the withholding of other information as deliberative under Exemption 5, and made no credible argument that disclosure of materials will reveal secret law enforcement techniques. In addition, BOP has failed to fulfill its obligations to search records in its custody.

1

But the crux of this case is BOP's unsupportable reliance on Exemption 7(A) to withhold thousands of pages of documents in whole or in part. The Government contends that disclosure of the records would interfere with the pending prosecutions of Nicholas Tartaglione (an ex-cop charged in four drug-related killings, who at one time shared a cell with Epstein), and of the two correctional officers on duty the night Epstein committed suicide, who are accused of falsifying paperwork to hide the fact that they were shopping for furniture online rather than completing their rounds. But the records at issue—e-mails, reports, and observation logs about Epstein's mental health; correspondence about Epstein's incarceration prior to his suicide; photos of the suicide; records of who visited or communicated with Epstein while he was in jail; and the like— bear no relationship to the charges at issue in those criminal prosecutions.

Because the Government has not met its burden of justifying withholding under FOIA, and consistent with "the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny,'" *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772 (1989), the records must be disclosed.

## FACTUAL BACKGROUND

### I.    Epstein's Arrest and Suicide

Until 2019, Jeffrey Epstein, a financier with connections to powerful people in politics, law, and academia, had never been held accountable for sexually abusing dozens of girls, including runaways and foster children, some as young as 14 or 15. *See* Patricia Mazzei, *Years After Plea Deal in Sex Case, Jeffrey Epstein's Accusers Will Get Their Day in Court*, N.Y. Times (Nov. 29, 2018), https://nyti.ms/2R5uf9L. In 2007, Epstein took a plea deal, avoiding federal criminal charges and instead pleading guilty to lesser state charges of soliciting prostitution and serving a jail sentence under terms that permitted him to work out of his office six days a week. *See id.* Epstein's luck ran out when, on July 2, 2019, he was charged with one count of

2

conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 371, and one count of sex trafficking, in violation of 18 U.S.C. § 1591. (*See* Declaration of Russell Capone, ECF No. 22 [hereinafter "Capone Decl."], at ¶ 4.) On July 6, 2019, he was arrested and charged by federal prosecutors and thereafter incarcerated at the MCC. (*Id.*) On July 10, 2019, Epstein was assigned to the Special Housing Unit ("SHU"), at least in part because of the risk of suicidal ideation. (*Id.* ¶ 5.) Nonetheless, on July 23, 2019, Epstein was found on the floor of his cell with a strip of bedsheet around his neck, having apparently attempted suicide. (*Id.* ¶ 6.) Epstein was then transferred out of the SHU, placed on suicide watch for 24 hours, and then put under psychological observation in MCC's hospital ward. (*Id.*) On July 30, 2019, Epstein was transferred back to the SHU. (*Id.*) On August 10, 2019, Epstein was found unresponsive in his cell with a noose around his neck. (*Id.* ¶ 7.) An autopsy confirmed that he had committed suicide by hanging himself. (*Id.*)

Since then, charges have been brought against Michael Thomas and Tova Noel, both correctional officers on duty at the SHU the night of Epstein's death, who allegedly failed to perform prisoner counts and then signed false certifications to conceal their failure to conduct those required counts. (*Id.* ¶ 9.) Also pending is federal prosecutors' case against Nicholas Tartaglione, who was charged in 2016 with killing four people in connection with a drug-trafficking crime. Tartaglione, for a time, was Epstein's cell mate—including on July 23, 2019, when Epstein first attempted suicide—but not after that.[1] (*Id.* ¶¶ 10–11.)

---

[1] Like the Government, and in accordance with the practice in FOIA cases in this District, The Times has not submitted a Local Rule 56.1 statement. *See N.Y. Times Co. v. U.S. Dep't of Justice*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) ("[T]he general rule in this Circuit is that in FOIA actions, . . . Local Civil Rule 56.1 statements are not required.").

## II.    Procedural History

The history of The Times's attempt to obtain public records in this case has been marked by BOP delay. On August 13, 2019, BOP received two FOIA requests from The Times, each seeking several categories of documents related to Epstein. (*See* Declaration of Kara Christenson, ECF No. 24 [hereinafter "Christenson Decl."], at ¶¶ 5–6.) BOP consolidated the requests and, on September 23, 2019, BOP denied the request in full, asserting that "any records responsive to your request are categorically exempt from disclosure" and that it would therefore not conduct a search. (*Id.* ¶ 7.) On October 3, 2019, The Times appealed the denial of those two requests. On December 12, 2019, while that appeal was pending, The Times submitted a third FOIA request for additional information, including Epstein's call log, e-mail correspondence while at MCC, visitor log, and lists of approved visitors, callers, and e-mail correspondents. (*Id.* ¶ 9.) On January 2, 2020, The Times submitted a fourth FOIA request, based on new information it learned, for recordings of the last three phone conversations Epstein had before he died. (*Id.* ¶ 10.)

On January 30, 2020, having not received documents responsive to any of the four requests, The Times filed this action. For a time, BOP doubled-down on its refusal to release any documents. On March 5, 2020, BOP responded to The Times's October 3, 2019 administrative appeal, affirming the denial of the request. Then, on April 15, 2020, the parties submitted a joint letter to the Court, in which BOP laid out its position that "any documents potentially responsive to the Times's request are exempt from disclosure under FOIA." ECF No. 11.

Only when this Court became involved did BOP finally acknowledge its obligations to abide by FOIA's dictates. After a conference with the Court on April 20, 2020, at which the Court ordered BOP to file its motion for summary judgment by June 22, 2020, BOP belatedly changed course. On June 11, 2020, BOP told the Court that it now intended to disclose some

4

records responsive to The Times's request and would complete its disclosure of records by July 7, 2020, and accordingly sought to postpone the deadline to file its motion for summary judgment to July 22, 2020.

On June 22, July 7, and July 10, 2020, BOP made three productions of documents to The Times. With respect to the first production, BOP released 10 pages in full and nine heavily redacted pages and withheld 434 pages in their entirety. With respect to the second, BOP released 66 pages in full and 328 redacted pages and withheld 1,093 pages. With respect to the third, BOP released 56 pages in full, redacted 67 pages, and withheld 1,566 pages. BOP subsequently discovered that additional documents had been "inadvertently omitted from its search" and sought an additional extension of time to file its opening brief. ECF No. 18. On August 5, 2020, BOP filed its motion for summary judgment. On August 11, 2020, BOP produced an additional five pages in full and 72 heavily redacted pages. On August 31, BOP produced a further 12 pages in full and 339 pages in part and withheld 135 pages. In total, BOP is withholding more than 3,000 pages, with another 800-plus pages redacted.

## ARGUMENT

FOIA requires that government records be made available to the public unless a statutory exemption applies. 5 U.S.C. § 552(a)(3)(A), (b)(1)–(9). "The basic purpose of FOIA reflect[s] a general philosophy of full agency disclosure." *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 360–61 (1976) (alterations omitted)). In light of this purpose, "FOIA exemptions are to be construed narrowly." *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 283 (2d Cir. 2009). There is a "strong presumption in favor of disclosure [that] places the burden on the agency to justify the withholding of any requested documents." *Id.* (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)); *see Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999). "[W]hen an agency

seeks to withhold information it must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977); *see* 5 U.S.C. § 552(b) (requiring the government to disclose "the exemption under which [each] deletion is made"). Failure to meet that burden requires disclosure of the requested documents. *See Nat'l Council of La Raza v. Dep't of Justice,* 411 F.3d 350, 355–56 (2d Cir. 2005).

A court reviews *de novo* an agency's decision to withhold information from the public. *See* 5 U.S.C. § 552(a)(4)(B). The agency's decision as to the applicability of a given exemption is entitled to no judicial deference. *See Bloomberg*, 601 F.3d at 147. Although courts review reasonably detailed agency affidavits with a presumption of good faith, this primarily is for determining the need for further fact-finding. *See, e.g.*, *Wood v. FBI*, 432 F.3d 78, 85 (2d Cir. 2005); *see also Wilner v. NSA*, 592 F.3d 60, 69, 73 (2d Cir. 2009) (presumption does not replace *de novo* review by courts).

The Government contends that the withheld information is exempt under FOIA Exemptions 7(A), 6, 7(C), 5, and 7(E).[2] None of those exemptions justifies the extent of BOP's redactions and withholdings here.

## I. The Government Has Not Met Its Burden of Showing the Search was Adequate

FOIA requires agencies to make reasonable efforts to locate responsive "agency records." 5 U.S.C. § 552(a)(3). Two requirements must be satisfied for materials to be deemed "agency records." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144–45 (1989). First, the agency

---

[2] The Times does not challenge the withholding of information protected by the attorney-client privilege. The Times also does not challenge the Government's withholding of the personally identifying information of BOP employees under Exemptions 6, 7(C), and 7(F).

must "either create or obtain the requested materials." *Id*. at 144 (internal quotation marks and citation omitted). Second, "the agency must be in control of the requested materials *at the time the FOIA request is made*." *Id*. at 145 (emphasis added). The Supreme Court was clear on what constitutes "control" for FOIA purposes: "By control we mean that the materials have come into the agency's possession in the legitimate conduct of its official duties." *Id*. Put simply, FOIA requires an agency to produce records under its control on the date the FOIA request comes in.

Here, BOP ignores that rule. It contends that it does not have possession of certain records, and therefore cannot produce them in response to The Times's requests, because it has turned those records over to other agencies. Specifically, BOP contends that it cannot produce the SHU log books showing when prison staff did rounds on certain days because they "were handed over to the Office of the Inspector General ('OIG') on or about August 22, 2019," and therefore "the BOP is no longer in possession of the log books" (Christenson Decl. ¶ 13; Declaration of Nicole McFarland, ECF No. 23 [hereinafter "McFarland Decl."], at ¶ 8). But, as BOP concedes, BOP received a FOIA request from The Times on August 13, 2019, seeking those logs for July 22 and 23 and August 9 and 10. (Christenson Decl. ¶ 5.) Accordingly, "at the time the FOIA request [was] made," BOP was in control of the requested records. *See Tax Analysts*, 492 U.S. at 145. BOP had a duty to preserve those documents and cannot now exclude them from the universe of responsive documents on the ground that it gave them away nine days after receiving The Times's request. *See Meyer v. Bush*, 1991 U.S. Dist. LEXIS 13626, at *32 n.44 (D.D.C. Sept. 30, 1991), *rev'd on other grounds*, 981 F.2d 1288 (D.C. Cir. 1993) (indicating that, when an agency transfers records after receiving a FOIA request, it "would have to suffer the consequences of [its] improper transfer and search those records, as well").

Similarly, BOP asserts that it cannot produce certain physical visitor logs because they "were handed over to the OIG on or about August 22, 2019, and BOP is no longer in possession of these logs." (Christenson Decl. ¶ 39; McFarland Decl. ¶¶ 17, 30). But, again, BOP had already received at least one FOIA request for the physical logs before it handed over the documents: On August 12, 2019, the National Legal and Policy Center submitted a FOIA request to BOP by e-mail, seeking, among other records, "[a]ll visitor logs of Epstein from July 23, 2019 to August 10, 2019." *See* National Legal and Policy Center, *NLPC Files FOIA Request Seeking Photos Of Jeffrey Epstein And Records Surrounding His Apparent Suicide* (Aug. 12, 2019), https://prn.to/3m1d0Vo; FOIA Request from Paul D. Kamenar, Counsel for NLPC, to BOP FOIA Officer (Aug. 12, 2019), https://bit.ly/2DGhxv9. Accordingly, under *Tax Analysts*, BOP had an obligation to preserve copies of the physical logs as of August 12, 2019, and should have produced them in response to The Times's request.[3]

## II.  The Government Has Not Met Its Burden of Justifying Withholding Under Exemption 7(A)

The Government contends that essentially all of the undisclosed records at issue may be withheld under Exemption 7(A). (*See* Mem. of L. in Supp. of the Fed. Bureau of Prisons' Mot. for Summ. J., ECF No. 25 [hereinafter "Gov't Br."], at 7.) Exemption 7(A) permits withholding of "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). "The principal purpose of Exemption 7(A) is to prevent disclosures which might prematurely reveal the government's

---

[3] BOP also contends that it cannot produce video camera footage relevant to Epstein's suicide and to Epstein's earlier suicide attempt because "all video/NICE vision equipment was handed over to the FBI on or about August 10, 2019." (Christenson Decl. ¶ 28.) Given BOP's record of disregarding its FOIA obligations in this case, BOP should be required to establish that it had no pending FOIA requests for the footage at the time of the turnover to the FBI.

cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its

investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy

or alter evidence." *Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 762 (D.C. Cir. 2000) (citing

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 227 (1978)). The agency affidavits or

declarations "must demonstrate specifically how each document or category of documents, if

disclosed, would interfere." *Gray v. United States Army Crim. Investigation Command*, 742 F.

Supp. 2d 68, 74 (D.D.C. 2010); *Campbell v. Dep't of Health and Human Servs*., 682 F.2d 256,

265 (D.C. Cir. 1982).

       To invoke Exemption 7(A), an agency must meet two requirements, neither of which is

met here. First, BOP must establish a rational nexus between the documents withheld and

enforcement of a federal law. *See, e.g.*, *Gonzalez v. U.S. Citizenship & Immigration Servs.*, 2020

U.S. Dist. LEXIS 134482, at *27 (S.D.N.Y. July 29, 2020) ("To show that particular documents

qualify as 'records or information compiled for law enforcement purpose,' an agency must

establish a rational nexus between the agency's activity in compiling the documents and 'its law

enforcement duties.'").[4] Second, BOP must establish that production of the records is likely to

---

[4] The Government suggests that because BOP is a law enforcement agency, any BOP records
qualify as law enforcement records. But, as the Government cannot help but acknowledge, courts
in this circuit—like the Ninth Circuit and the D.C. Circuit—have squarely rejected that *per se*
approach, instead requiring a rational nexus to enforcement of a federal law. *See Human Rights
Watch v. Dep't of Justice & Fed. Bureau of Prisons*, 2015 U.S. Dist. LEXIS 123592, at *10–14
(S.D.N.Y. Sept. 16, 2015) ("To acknowledge that 'law enforcement purpose' defies rigid
formulation, then, is not to allow all information about BOP administration and procedure to
satisfy the Exemption 7 threshold."); *Gonzalez*, 2020 U.S. Dist. LEXIS 134482, at *27; *Malizia
v. U.S. Dep't of Justice*, 519 F. Supp. 338, 347 (S.D.N.Y. 1981) ("To meet this requirement an
agency must demonstrate at least 'a colorable claim of a rational nexus' between activities being
investigated and violations of federal laws."); *see also Church of Scientology v. U.S. Dep't of the
Army*, 611 F.2d 738, 748 (9th Cir. 1979) (holding that agencies with a law enforcement mandate
must "establish a 'rational nexus' between enforcement of a federal law and the document for
which an exemption is claimed"); *Pratt v. Webster*, 673 F.2d 408, 420 (D.C. Cir. 1982) ("To
satisfy this requirement of a 'nexus,' the agency should be able to identify a particular individual

interfere with enforcement proceedings. *See* 5 U.S.C. § 552(b)(7)(A); *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236 (1978); *see also, e.g.*, *Radcliffe v. IRS*, 536 F. Supp. 2d 423, 437 (S.D.N.Y. 2008) ("Affidavits must contain more than mere conclusory statements to show why disclosure of requested documents could reasonably be expected to interfere with enforcement proceedings."). Here, the enforcement proceedings cited by BOP—the prosecutions of Nicholas Tartaglione for a murder years ago and Michael Thomas and Tova Noel for falsifying records— bear little relationship to the particular documents at issue, which deal with BOP's treatment of Epstein, including psychological treatment, and Epstein's contacts with people who are not associated with BOP.[5]

The charges against Tartaglione have nothing to do with Epstein. Tartaglione is charged with one count of conspiracy to distribute narcotics, four counts of intentional killing in furtherance of a drug trafficking crime, three counts of murder through the use of a firearm in furtherance of a drug trafficking crime, one count of conspiracy to commit kidnapping, four counts of kidnapping resulting in death, and four counts of using a facility of interstate commerce to commit a crime of violence, all arising from the murder of four individuals in April 2016, none of whom has any connection to Epstein. (Capone Decl. ¶ 10.) BOP has withheld, on account of purported interference with the Tartaglione prosecution, reports and evidence of Epstein's July 23, 2019 apparent suicide attempt, reports and evidence of Epstein's death on August 10, 2019, medical and psychological records of Epstein prepared by BOP, and emails

---

or a particular incident as the object of its investigation and the connection between that individual or incident and a possible security risk or violation of federal law.").

[5] Although the Government devotes a portion of its Facts section to discussing the prosecution of Epstein himself, that of course cannot justify withholding under Exemption 7(A), as Judge Berman entered an order of *nolle prosequi* against Epstein on August 29, 2019. (Capone Decl. ¶ 8.)

pertaining to Epstein's July 23, 2019 apparent suicide attempt, Epstein's mental and physical health, and Epstein's incarceration prior to his suicide.[6]

The Government has provided no credible basis for concluding that disclosure of the records at issue would interfere with Tartaglione's prosecution for murder and related crimes. The Government instead weaves a convoluted theory about how BOP records might somehow play a role in the penalty phase of Tartaglione's trial at some distant point in the future if Tartaglione is convicted. The theory goes like this: Tartaglione shared a cell with Epstein for a period of time, including July 23, 2019 (but not at the time of his death, when some of the so-called "Tartaglione Records" were created). Therefore, some of the documents about Epstein's conditions of confinement may somehow shed light on Tartaglione's conditions of confinement at the facility. As a result, those conditions of Tartaglione's confinement at the MCC may be relevant to the penalty phase of the Tartaglione case.

The theory falls far short of what the Government needs to show to overcome the presumption of openness that is central to FOIA. The theory would effectively prevent any information about prison conditions from ever being disclosed because there will always be some prisoner whose trial date is pending and whose defense counsel may seek to introduce evidence about their conditions of confinement at some stage of the trial. BOP will always be able to argue that disclosing information about prison conditions could color the perceptions of potential jurors for some potential trial at some point in the future. Such generalized concerns are insufficient under FOIA. *See, e.g.*, *Gray*, 742 F. Supp. 2d at 74; *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 565–66 (S.D.N.Y. 1989) (rejecting "generalized discussion" and "boilerplate descriptions" of the harm from disclosure as insufficient to carry the government's

---

[6] As noted above, The Times does not contest the withholding of "email correspondence between Tartaglione's attorneys and legal counsel at the MCC." (Capone Decl. ¶ 28.)

burden on Exemption 7).[7] That Epstein and Tartaglione were cellmates, without more, is not enough to show that disclosure would prematurely reveal the Government's case against Tartaglione or otherwise interfere with the proceedings. Whatever the statutory phrase "could reasonably be expected to interfere" may mean in close cases, here the Government effectively replaces "reasonable expectations" with "speculation about a possibility."

The Government's case fares no better with respect to the Thomas and Noel prosecutions. BOP contends that several categories of BOP records could interfere with these proceedings, including (1) MCC staffing records; (2) reports and memoranda prepared by BOP concerning Epstein's July 23, 2019 suicide attempt, Epstein's August 10, 2019 suicide, and MCC and BOP's response to Epstein's death; (3) medical and psychological records of Epstein; (4) documents related to inmate counts; (5) an August 8, 2019 review of inmates in the SHU; (6) emails pertaining to Epstein's July 23, 2019 suicide attempt, his incarceration before his suicide, and his mental health; and (7) emails relating to Epstein's death, investigations into Epstein's death, and BOP's response to Epstein's death. (Capone Decl. ¶¶ 12–26.)

Those records bear little relationship to the prosecutions of Noel and Thomas for making false statements and for conspiring to defraud the United States in connection with falsely attesting to having conducted multiple inmate counts when they had not done so. (The focus of those prosecutions is on the false certifications they are alleged to have signed.) A June 9, 2020 order by Judge Torres, denying Thomas's motion to compel "disclosure of 'reports generated by

---

[7] The Government's vague allegations of the impact of disclosure on juror testimony also entirely disregard the voir dire process, which "can play an important role in reminding jurors to set aside out-of-court information and to decide the case upon the evidence presented at trial." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1055 (1991) (holding that risk of prejudice from pretrial publicity was insufficient to justify restricting attorney speech about ongoing proceedings). As the Supreme Court observed, "[e]mpirical research suggests that in the few instances when jurors have been exposed to extensive and prejudicial publicity, they are able to disregard it and base their verdict upon the evidence presented in court." *Id.* at 1054–55.

investigators within the [BOP] regarding' Epstein's death," makes clear as much: Judge Torres

found "no evidence" that the prosecutors in the *Noel* and *Thomas* cases "reviewed information

arising from a BOP investigation" into Epstein's death. *United States v. Noel*, No. 19-CR-00830-

AT, ECF No. 36 (June 9, 2020 Order), at 7–8. Information that *is* relevant to the *Noel*

prosecutions—"all of the materials gathered by OIG [Office of Inspector General] personnel in

the course of investigating [the *Noel*] case," including "count slips, thirty minute round forms,

and staffing rosters for the three-week period surrounding Epstein's suicide"—was already

disclosed to Thomas and Noel, *id.* at 2, 5–6, and the Government has not established that that

disclosure was subject to any kind of protective order.[8] And because defendants have received

the BOP information relevant to their cases, BOP has failed to show that disclosures here would

disclose the prosecution's strategies or tactics or otherwise interfere with the trial. *See Maydak*,

218 F.3d at 762. The Government speculates that some of the documents may be trial exhibits or

used in preparing witnesses, but the 7(A) standard focuses on "interference" with the

prosecution's tactics or strategy, and nothing on the face of the documents indicates whether a

particular document might be used by the prosecutors, let alone how. Certainly, the Government

is not suggesting that it plans to use stealth evidence to get a conviction.

## III.    The Government Has Not Met Its Burden of Justifying Withholding Under Exemptions 6 and 7(C)

The Government also seeks to justify withholding or redacting several categories of

documents under Exemptions 6 and 7(C). Both exemptions provide limited protection for

privacy interests, which must be balanced against the public interest in disclosure. Exemption 6

---

[8] If there is in fact any material responsive to The Times's requests that is subject to a protective order and that is expected to be introduced into evidence as exhibits at trial, the Government ought to specifically identify that material in a sealed declaration to this Court. BOP cannot simply rest on the generalized assertion that "*some* of the records withheld under Exemption 7(A) will be entered into evidence as exhibits at trial." (Capone Decl. ¶ 15 (emphasis added).)

applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The provision contemplates a balancing between the privacy interests in the information sought and the public interest in disclosure. *See Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 291 (2d Cir. 2009) (citing *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976)). The "requirement that disclosure be 'clearly unwarranted' instructs [courts] to tilt the balance . . . in favor of disclosure." *Morley v. C.I.A.*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (internal marks omitted). "[U]nder Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008). Similarly, Exemption 7(C)—which exempts from disclosure records or information compiled for law enforcement purposes if release "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C)—requires that a court "balance the public interest in disclosure against the [privacy] interest." *Associated Press*, 554 F.3d at 284.[9]

The information withheld under Exemptions 6 and 7(C) fall into two categories: (1) details of Epstein's death and images of his body and (2) names of third-party individuals that appear on call logs, visitor logs, and Epstein's approved call list and visitor list.[10] Neither category may properly be withheld.

With respect to the first category, a person's privacy interests after death are minimal at best. *See Diamond v. FBI*, 707 F.2d 75, 77 (2d Cir. 1983) (noting that "death . . . so diminished

---

[9] Because Exemption 7(C) is more protective than Exemption 6—the former uses the language "could reasonably be expected" while the latter refers to "would reasonably be expected"—the 7(C) language is operative when both exemptions apply.

[10] Insofar as the Government has withheld contact information such as phone numbers or addresses of third-party individuals not associated with BOP, The Times does not challenge these withholdings.

any privacy interest as to amount to a waiver"); *Wessler v. U.S. Dep't of Justice*, 381 F. Supp. 3d

253, 259 (S.D.N.Y. 2019) ("[A] personal privacy interest fades with the death of the subject of

the medical records."). In limited circumstances, surviving family members may have

independent privacy interests with respect to their close family's death-scene images. *See Nat'l*

*Archives & Records Admin. v. Favish*, 541 U.S. 157, 165–71 (2004). But unlike the *Favish* case

cited by the Government, in which the Court relied upon a sworn declaration from the deceased's

sister describing the harassment that the family had experienced, here the Government makes no

effort to describe whose interests would be hurt how, referring only in vague terms to the privacy

interests of Epstein's surviving family members. Epstein's parents died long ago, and he was

unmarried and (at least officially) childless. His sole surviving relative is his brother Mark, who

has said they "were not that close" and is himself eager for more documents to be released by

BOP. *See* Julie K. Brown, *Jeffrey Epstein Wasn't Trafficking Women – And He Didn't Kill*

*Himself, Brother Says*, Miami Herald (Nov. 14, 2019), https://hrld.us/3ibIANJ (noting that

"Mark Epstein said he is awaiting further documents they've requested from the medical

examiner, the paramedics and the Bureau of Prisons" to support his contention that Epstein died

by homicide and not suicide). In short, there is no reason to believe that any family member of

Epstein has any interest in nondisclosure.

      With respect to the second category, the Government has not established that any third

parties have a privacy interest in nondisclosure or that disclosure of the records at issue would

cause additional incremental harm, in light of all the information that has already been disclosed

about Epstein's lawyers and his wide circle of acquaintances. Hundreds, if not thousands, of

articles have been written about Epstein, at least four miniseries have been produced or are in the

works, and countless celebrities have had their ties to Epstein publicly dissected. The names of

lawyers on Epstein's legal team, including Reid Weingarten, Martin G. Weinberg, and Michael Miller, have been widely publicized. *See, e.g.*, Ali Watkins & Michael Gold, *Jeffrey Epstein Autopsy Results Show He Hanged Himself in Suicide*, N.Y. Times (Aug. 16, 2019), https://nyti.ms/3bBRMsi. Epstein is known to have summoned numerous lawyers to visit him at MCC, including David Schoen, whom he met with in the days after his initial suicide attempt. *See, e.g.*, Ali Watkins, Danielle Ivory & Christina Goldbaum, *Inmate 76318-054: The Last Days of Jeffrey Epstein* (Aug. 17, 2019), https://nyti.ms/3h8uED2. Reporting has also identified individuals—such as Epstein associates Sarah Kellen and Nadia Marcinkova—who met with him when he was in jail in Florida, as well as individuals who remained close to him until the time of his death, such as longtime associates Darren K. Indyke and Richard D. Kahn, whom Epstein named as executors of his will. *See* Skyler Swisher & Marc Freeman, *Jeffrey Epstein's Special Treatment in Jail Was Far More Lenient Than Anyone Knew*, S. Fla. Sun Sentinel (Aug. 16, 2019), https://bit.ly/33cq4yD; Steve Eder & Ali Watkins, *Jeffrey Epstein's Will: He Signed 2 Days Before Killing Himself*, N.Y. Times (Aug. 19, 2019), https://nyti.ms/2R6XR6Q. Finally, there has been widespread reporting about individuals listed in Epstein's "little black book"— thought to be a diary of his houseguests or people in his social circle, ranging from household names like Prince Andrew, Donald Trump, Ken Starr, and Alan Dershowitz, to lesser known individuals like film producers, fashion executives, magazine editors, and others. *See, e.g.*, Nick Bryant, *Here Is Pedophile Billionaire Jeffrey Epstein's Little Black Book*, Gawker (Jan. 23, 2015), https://bit.ly/2DExAcI.

In short, withholding the names of persons known to have associated with Epstein serves no privacy interest. Their connection to Epstein is no secret, and disclosure of the fact that they visited or communicated with Epstein during this period of time would cause no incremental

harm. As to others, whatever privacy interest exists is easily overcome by the weighty public interest in disclosure.[11] The focus of the privacy analysis is whether "disclosure would serve the core purpose of FOIA, which is contributing significantly to public understanding of the operations or activities of the government." *N.Y. Times Co. v. FCC*, 2020 U.S. Dist. LEXIS 76710, at *13–14 (S.D.N.Y. Apr. 30, 2020) (quoting *Cook v. Nat'l Archives & Records Admin.*, 758 F.3d 168, 177 (2d Cir. 2014)), *appeal docketed*, No. 20-2042 (2d Cir. June 26, 2020).

The Government itself has implicitly *admitted* that BOP operations failed when it brought criminal charges against the two BOP officers on duty the night of Epstein's suicide. *See United States v. Noel*, No. 19-cr-830 (AT) (S.D.N.Y.). A recent report by the Department of Justice's Office of Inspector General has revealed further problems at MCC and BOP generally, including the failure to properly monitor terrorist inmates' phone calls and visits due to inadequate technology. *See* Office of the Inspector General, *Audit of the Federal Bureau of Prisons' Monitoring of Inmate Communications to Prevent Radicalization* (March 2020), https://bit.ly/3m51vvU. The records requested relate directly to MCC practices and procedures: whether Epstein was accorded special treatment when it came to visits, calls, and deposits of money; whether he was subject to more restrictive rules than others; whether BOP personnel were effectively screening visitors who might represent a threat or assist in further criminal acts by Epstein or on behalf of him; and whether BOP's recordkeeping was accurate—a relevant concern in light of the prosecutions in this case.

---

[11] The Government gets the balancing test precisely backwards when it contends that "the publicity and unfounded speculation surrounding Epstein's death make it more likely that disclosure of personally identifying information of an individual who interacted with Epstein or participated in the response to his death would cause an unwarranted invasion of privacy." (Gov't Br. 19–20.) Just the opposite: the privacy interest in nondisclosure is fixed, but the significant media attention demonstrates the newsworthiness of the information and heightens the public interest in disclosure.

The President himself has highlighted the public interest in disclosure of documents regarding Epstein. As he put it in a recent interview, "people are still trying to figure out how [Epstein died in jail]." Zapotosky, *Trump questions whether Jeffrey Epstein was killed in federal custody, supra*. The possibility that the records could shed light on that fact favors disclosure, too.

## IV. The Government Has Not Met Its Burden of Justifying Withholding Under Exemption 5

Exemption 5 permits an agency to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). As noted above, The Times does not contest the withholding of communications between BOP employees and Assistant United States Attorneys pursuant to the attorney-client privilege. However, the Government also seeks to withhold under Exemption 5 documents pertaining to where and how Epstein was housed and how Epstein died. With respect to these records, the Government has not met its burden of establishing that the records are both predecisional and deliberative, *see Grand Central P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999), or that disclosure would foreseeably harm the candid exchange of recommendations during the policymaking process, as required under the 2016 FOIA Improvement Act, *see* 5 U.S.C. § 552(a)(8)(A).

The deliberative process privilege applies to "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *Sears*, 421 U.S. at 150). But the records withheld are largely not akin to advisory opinions or policy recommendations and do not relate to any policymaking process. BOP has improperly deemed a broad range of documents deliberative: an incident report

18

of Epstein's apparent suicide attempt, a psychological reconstruction (or psychological autopsy) of his suicide, e-mails and other unspecified documents about Epstein's housing at MCC, responses to Epstein's suicide, and responses to press inquiries. Emblematic of the misuse of the exemption are the incident report of the suicide attempt and the psychological reconstruction, both of which appear to be essentially factual documents summarizing and analyzing events that have already taken place. Indeed, according to guidance issued by BOP, psychological reconstructions of inmate suicides include background information about the inmate, medical history, a full description of the suicide act and scene, information such as staff and inmate opinions of the deceased, and interviews with staff and other inmates. Fed. Bureau of Prisons, *Program Statement: Suicide Prevention Program* (Apr. 5, 2007), https://bit.ly/3ioiEyN [hereinafter "BOP Program Statement"]. These withheld documents are not recommendations and advice from employees to management about shaping policies.

The Government's assertion that the records contain policy recommendations about "how MCC should change its suicide prevention policies and measures" (Gov't Br. 15) is not obviously borne out by the face of the descriptions. But even if the description is right, it does not justify blanket withholding. FOIA requires that the Government redact the relevant deliberative portions, rather than withhold in full. *See, e.g.*, *Envt'l Prot. Agency v. Mink*, 410 U.S. 73, 88–91 (1973) ("Exemption 5 . . . requires different treatment for materials reflecting deliberative or policymaking processes," which are exempt from disclosure, and "purely factual, investigative matters," which are not exempt); *Grand Central P'ship*, 166 F.3d at 482 ("Purely factual material not reflecting the agency's deliberative process is not protected."); *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988) (same); *Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1991) (same). Accordingly, all factual

information—including information about how Epstein was in fact housed at MCC and who he shared a cell with, and the factual determinations of the psychological reconstruction—is required to be disclosed. The same analysis applies to other documents withheld as deliberative, including emails exchanged within BOP about Epstein's housing at MCC, Epstein's suicide, and BOP's immediate response.

Finally, the Government has not met its "independent and meaningful" burden under the 2016 FOIA Improvement Act. *NRDC v. EPA*, 2019 U.S. Dist. LEXIS 124353, at *2 (S.D.N.Y. July 25, 2019). The 2016 Act provides that agencies relying on discretionary exemptions (including all of the exemptions at issue in this case) may withhold information only if the agency reasonably foresees that disclosure would cause harm to an interest protected by the exemption. *See* 5 U.S.C. § 552(a)(8)(A). In passing this Act, "Congress was especially concerned about agencies' reliance on Exemption 5 and the deliberative process privilege." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 2019 U.S. Dist. LEXIS 223077, at *20 (D.D.C. Dec. 31, 2019) (holding that the Government failed to meet its burden of showing foreseeable harm to an interest protected by Exemption 5). With respect to the psychological autopsy, for example, the Government's declarant states that disclosure "would hamper frank and open discussions and assessments by [senior BOP] officials in reaching policy decisions." (Christenson Decl. ¶ 49(b).) Such generalized, boilerplate assertions are insufficient to meet the Government's burden. *See id.* at *25; *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100–01 (D.D.C. 2019) (rejecting an agency's "general" "boiler plate" claims of harm to the deliberative process); *see also* S. Rep. No. 114–4, at 8 (2015) ("[M]ere speculative or abstract fears . . . are an insufficient basis for withholding information.").

**V.    The Government Has Not Met Its Burden of Justifying Withholding Under Exemption 7(E)**

Exemption 7(E) permits an agency to withhold law enforcement records that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The exemption protects only techniques and procedures "not generally known to the public." *Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 52 n.4 (2d Cir. 1985). Thus, where the agency fails to establish that "the material being withheld truly embod[ies] a specialized, calculated technique or procedure" unknown to the public, Exemption 7(E) does not apply. *ACLU Found. v. Dep't of Homeland Sec.*, 243 F. Supp. 3d 393, 405 (S.D.N.Y. 2017); *see also, e.g.*, *Knight First Amendment Inst. v. U.S. Dep't of Homeland Sec.*, 407 F. Supp. 3d 334, 354 (S.D.N.Y. 2019) (rejecting the government's invocation of Exemption 7(E) where it "remain[ed] unclear" how the records "embod[ied] a specialized, calculated technique or procedure"); *Albuquerque Publ'g Co. v. U.S. Dep't of Justice*, 726 F. Supp. 851, 857 (D.D.C. 1989) (rejecting the government's invocation of Exemption 7(E) where there was "nothing exceptional or secret about the techniques it described"); *Kubik v. U.S. Fed. Bureau of Prisons*, 2011 U.S. Dist. LEXIS 71300, at *34 (D. Or. July 1, 2011) (holding that tactical maneuvers used during prison riots "are no secret to the prison inmates" and ordering disclosure of records, even if those records would reveal the location of a security camera that the inmates were assumed to be unaware of).

Here, the Government has not met its burden of showing that techniques for preventing prison suicide are generally unknown. Countless reports have been publicly released on how to prevent suicide in jails and prisons—including several reports issued by the federal government. *See, e.g.*, U.S. Dep't of Justice Nat'l Inst. of Corrections, *Prison Suicide: An Overview and*

*Guide to Prevention* (1995), https://bit.ly/2FhaZnb [hereinafter "DOJ Guide to Prevention"];

Fed. Bureau of Prisons, *Suicide Prevention in a Correctional Setting – Lessons Learned* (Dec.

2011), https://bit.ly/3m1fUt3 (listing lessons such as "Double celling offenders prevents

suicide"; "Cover vents with expanded metal to prevent tie-off points"; and "Ensure sprinkler

heads cannot be used as tie-off points"); BOP Program Statement (describing new suicide

prevention guidance); U.S. Dep't of Justice Nat'l Inst. of Corrections, *National Study of Jail*

*Suicide: 20 Years Later* (Apr. 2010), https://bit.ly/3lYuoKm (describing instruments used to

commit suicide, such as the use of bedding, clothing, shoelaces, belts, and telephone cords for

hangings along with various anchoring devices).

Those reports describe in detail how certain practices, such as holding victims in isolation

or segregation cells, tend to increase the risk of suicide. They explain how to mitigate the risk of

prisoner suicide, such as by training correctional staff, conducting psychological screenings at

intake and at regular intervals, constantly supervising those who are actively suicidal and closely

observing those at risk at 5-15 minute staggered intervals, housing inmates in dormitories or

shared cells, eliminating or minimizing unsupervised access to potentially lethal materials such

as bed sheets or shoe laces, and having multidisciplinary team meetings involving correctional,

health care, and mental health personnel. *See* World Health Organization, *Preventing Suicide in*

*Jails and Prisons* (2007), https://bit.ly/2GHiHro. They provide a "Suicide Potential Checklist,"

enumerating questions that should be asked to assess an inmate's suicide risk, detailed post-

suicide procedures, and lists of equipment that should be available to officers responding to

incidents of attempted suicide. *See* DOJ Guide to Prevention, at 24–25, 43. They even provide a

template for a psychological reconstruction of an inmate suicide and a sample memorandum

documenting mock suicide emergency training. *See* BOP Program Statement, at 20–25.

In short, there is nothing secret about what policies prisons ought to have in place to prevent suicide or how prisons investigate and respond to suicides and suicide attempts. Because there is no reason to believe that the records BOP is withholding would reveal any law enforcement techniques and procedures that are not already generally known, the Government has not met its burden of demonstrating that Exemption 7(E) applies, and the records are required to be released.

<u>**CONCLUSION**</u>

For each and every one of the reasons set forth above, Plaintiff respectfully asks this Court to (i) declare that the documents sought by The Times are public under 5 U.S.C. § 552 and must be disclosed; (ii) order BOP to provide the requested documents to The Times within 20 business days of the Court's order; (iii) award The Times the costs of this proceeding, including reasonable attorneys' fees, as expressly permitted by 5 U.S.C. § 552(a)(4)(E); and (iv) grant such other and further relief as the Court deems just and proper.

Dated: New York, NY
       September 10, 2020

                          Respectfully submitted,

                          By: <u>/s/ David E. McCraw</u>
                          David E. McCraw
                          Al-Amyn Sumar
                          Alexandra Perloff-Giles
                          The New York Times Company
                          Legal Department
                          620 Eighth Avenue
                          New York, NY 10018
                          Phone: 212-556-4031
                          Facsimile: (212) 556-4634
                          Email: mccraw@nytimes.com

                          *Counsel for Plaintiff*